UNITED STATES of America,

v.

**Michael Kazuo YANAGITA, Defendant.**

**UNITED STATES of America,**

v.

**Marc Choyei KONDO, Defendant.**

Nos. 76 Cr 420, 76 Cr 421.

United States District Court,
E. D. New York.

Aug. 17, 1976.

---

James Reif, Amy Gladstein, Brooklyn, N. Y., for defendants.

Ethan Levin-Epstein, Asst. U. S. Atty., for the Government.

DOOLING, District Judge.

Each of the defendants was, it is admitted for present purposes, called as a witness for the Government during the trial of *United States v. Chin and Young*, 75 CR 851(S). Each declined to answer on the ground that his testimony might be used to incriminate him, and each was then ordered to answer. The order was in each case, professedly made under 18 U.S.C. 6003(a) with the intended effect, under Section 6002, that no testimony given in obedience to the order (nor any information derived from it) "may be used against the witness in any criminal case, except a prosecution for perjury . . . or otherwise failing to comply with the order." On the advice of counsel each defendant declined to testify, and, despite warnings and an adequate opportunity to reconsider their refusals to testify, both defendants continued to decline to testify and were committed to the custody of the Attorney General or the Marshall "for a period not to exceed one (1) month from" the date of the order, June 22, 1976, "or until such a time as the trial of the [*Chin* and *Young* case], now in progress, shall reach a verdict." The order did not contain an explicit purge provision. However, it was made clear to each defendant, of record in open court, that he could purge himself by testifying at any time before the verdict was rendered, and that if he persist-

ed in his refusal to testify, he might face further proceedings. Defendants filed notices of appeal to the Court of Appeals from the commitment orders and applied in that Court for a stay of commitment. The stay was denied. The appeal has evidently not been prosecuted, and motions by defendants to withdraw the appeals are pending.

■ 1. It is argued that the defendants have already been punished for their alleged contempt by being jailed for the duration of the trial and cannot constitutionally be punished a second time. Despite the form of the commitment orders, each order was in its setting and operative terms a civil order of contempt intended to obtain the witness's testimony, 28 U.S.C. 1826(a). The matter of punishment, as distinguished from coercion to testify was reserved. Whether or not it should be the law, it appears to be settled, by implication, and it is not at this time denied, that the same acts may be made the subject of two commitments, one civil and addressed simply to obtaining the testimony, and the other for criminal contempt consisting in the disobedience of the order to testify (18 U.S.C. 401(3)).

2. Defendants are citizens of the United States by birth and are residents of the United States. Their testimony was expected to disclose their role in furnishing firearms to Chin. The Government apparently had evidence or information—quite irrelevant to the charges in *United States v. Chin and Young,* 75 CR 851(S)—that Chin and Young planned to make an attempt on the life of Emperor Hirohito of Japan when he visited New York in October 1975. Defendants argue that the order under 18 U.S.C. 6002 does not protect them against the use of their evidence against them in a criminal proceeding in Japan and that defect legitimated their refusal to testify. Defendants refer to sections of the Japanese Penal Code punishing "insurrectionary or seditious" acts committed "with the object of overthrowing the government, seizing the territory of the .state, or otherwise subverting the national constitution," and punishing complicity in such acts or at-

tempts at them, punishing those who prepare or conspire civil war, and punishing those who aid in such crimes by furnishing arms. Under the Code such acts, if committed outside Japan, subject the actor to Japan's criminal jurisdiction.

■ It is doubtful in the extreme that the rather careful language of the Code extends to assassination of the emperor who, under the Constitution, is emphatically not the sovereign but is "the symbol of the State and of the unity of the people." But in any case the alleged fear of Japanese prosecution is too chimerical to be a factor; there is no more reason to expect prosecution than to expect the Japanese court to exclude the testimony as coerced.

■ The development of the law in and since *Murphy v. Waterfront Commission,* 1964, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678, emphasizes, as the dominant factor in analysis, the extent to which incompleteness of protection against later use of the testimony ought to constitute a lawful ground for refusing to obey the order to testify. A factor in such an analysis, where a risk of foreign prosecution arises, must be the attitude of the foreign jurisdiction toward judicially compelled testimony and self-incrimination. It is certainly more than merely arguable that if the foreign jurisdiction recognizes a privilege against self-incrimination and rejects judicially compelled self-incriminatory testimony, it would and could be expected to recognize the rule in the Murphy case or a comparable rule. On the other hand, if the foreign state did not accord a privilege against self-incrimination and used conventional judicial sanctions to compel an accused's testimony, it would be difficult to say that such a circumstance should inhibit use of the testimony in this country: no local or foreign right or privilege of the witness would be invaded by compelling the testimony.

■ Finally, it is by no means clear that if a foreign country sought extradition on the basis of testimony that had been compelled under an order of a court in the United States under such a statute as 18

U.S.C. 6002, 6003, or information derived from such testimony, that the source of the information could not be a ground for defending against the extradition proceeding conducted in a court of the United States. So much would appear to flow from the language of Section 6002.

■ It is concluded that the order did protect each defendant adequately against future use of the testimony against him.

3. Defendants argue that they had experienced difficulties with their telephone communications that led them to infer, at least when they put their telephone experiences in context with the Government's apparent knowledge of facts that might have been learned from overhearing certain telephone conversations, that their telephones might have been tapped. When summoned to testify they raised the point with the United States Attorney and in Court. The Court accepted and acted upon the Assistant United States Attorney's assurance that there was no record in the Bureau of Alcohol, Tobacco and Firearms, the investigating and charging agency, of such eavesdropping and that there was no such eavesdropping known to the United States Attorney's office. Defendants argue that the obvious gap in the "agency check" was in not making inquiry of either the Secret Service or the Federal Bureau of Investigation, both of which agencies had a role in the development of the investigation out of which the firearms indictment grew. Defendants point out that they drew the United States Attorney's attention to these two agencies.

■ Certainly if this were all, the inquiry made by the United States Attorney's office and reported to the Court would not satisfy the standard of *United States v. Toscanino,* 2d Cir. 1974, 500 F.2d 267, 281; cf. *United States v. Grusse,* 2d Cir. 1975, 515 F.2d 157, 158. But the trial court had held that the challenge to the proceedings to compel testimony based on the allegation of illicit eavesdropping came too late, and that the application was not sufficient to impose on the Government the duty to make an agency search under 18 U.S.C. 3504. The

question, then, is whether that determination is reviewable in the district court as a threshold issue to be redetermined before the criminal contempt trial can commence. In ordinary course, the trial judge's determination would be "the law of the case" unless reversed on appeal, and it is difficult to say that the criminal contempt trial is not the same "case," if in an extended sense. But the ultimate issue in the criminal contempt case is different: the adversary parties are the same but the confrontation is on a new although pendent issue. It is concluded with reluctance and misgivings that the issue must be re-examined.

■ It is concluded that, whatever the unfortunate effect of the tactics resorted to by counsel for the defendants, there was not a sufficient evidentiary base to support a conclusion that the motion was unduly delayed and could not be regarded as timely. So far as concerns the conclusion that the defendants' showing did not impose on the Government the duty, under 18 U.S.C. 3504, to make a broader agency check, the record leaves it unclear whether that conclusion was a finding based on the motion papers or was in part derived from the partial agency check that Mr. Pattison was able to make and to relate in his affidavit. The affidavits submitted for the defendants were certainly not demonstrative that their telephones were wire-tapped: they sufficed in reporting a coincidence of telephone malfunction and reporting the possession by a Government agent of information that could have been derived from telephonic eavesdropping. Cf. *In re Millow,* 2d Cir. 1976, 529 F.2d 770, 774. The affidavits did not have to go farther; the person whose telephone has been covertly tapped is inevitably hard put to demonstrate that that occurred which was designed to be indiscoverable. The affidavits were not really met by any intimation of what other source had led the Government to the defendants and to their link with Chin and Young. There remains, then, the unexplained failure to make any check with FBI and Secret Service agents in a case that may well have grown out of the alleged assassination plot

investigation in which those agencies participated.

 It is therefore concluded that the orders to testify were not based upon a sufficient assurance that illicit wiretapping had no part in developing the defendants as witnesses.

 It is not now possible, as in many Grand Jury cases, to have an evidentiary hearing to determine whether or not there were any wiretaps and whether or not, if there were, they were what led to the defendants' questioning. In many of the Grand Jury cases the witness can still be called and the testimony compelled if there has been no illicit eavesdropping. The original direction to testify is invalidated, but, after a hearing, a new direction can be given. That is not true in the case of the witness at a criminal jury trial whose refusal to testify might determine the outcome of the case. But *United States v. Huss*, 2d Cir. 1973, 482 F.2d 38, 44, accepted the Government's concession that the trial witness, like the Grand Jury witness, is protected by 18 U.S.C. 2515, 3504. As *Gelbard v. United States*, 1972, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179, put the power of a Grand Jury witness to decline to testify squarely on the statutory policy behind and the language of 18 U.S.C. 2515 and not on any constitutional ground, cf. *United States v. Calandra*, 1974, 414 U.S. 338, 347–349, 354–355 and fn. 11, 94 S.Ct. 613, 38 L.Ed.2d 561, the ground of the concession is plain enough, and the damage to orderly trial proceedings appears to be irremediable. *Cf. United States v. Huss, supra*, 482 F.2d at 45 and fn. 6. That *Gelbard* as extended to the trial witness requires further scrutiny in the appellate courts (*cf. Stone v. Powell*, 1976, —— U.S. ——, 96 S.Ct. 3037, 49 L.Ed.2d ——), or perhaps better, by the Congress, is clear. It is difficult, under Section 2515 as now understood, to visualize the circumstances in which a criminal contempt charge is proper if a trial witness is advised by and relies on counsel. *Cf. Maness v. Meyers*, 1975, 419 U.S. 449, 460, 465–467, 473 (concurring opinion), 95 S.Ct.

584, 42 L.Ed.2d 574; *United States v. Leyva*, 5th Cir. 1975, 513 F.2d 774, 777.

4. It is argued that in the case of defendant Kondo, 18 U.S.C. 6003(b) was not complied with. That subsection requires that the United States Attorney's request for an order under Section 6003(a) be approved by the "Attorney General, the Deputy Attorney General, or any designated Assistant Attorney General." The letter of approval in defendant Kondo's case was signed by a Deputy Assistant Attorney General (as Acting Assistant Attorney General) in the stated absence from Washington of the Assistant Attorney General in charge of the Criminal Division and his senior Deputy Assistant. The Department of Justice regulations in 28 C.F.R. 0.175 contain the Attorney General's delegation to the Assistant Attorney General in charge of the Criminal Division of his powers of approval under Section 6003 and the Assistant (like certain other assistants, such as the Assistant in Charge of the Antitrust Division) is, with them, authorized to redelegate that authority "to their respective Deputy Assistant Attorney Generals to be exercised solely during the absence of such Assistant Attorney Generals from . . . Washington" (28 C.F.R. 0.178). The reported practice in the Division is that the ranking deputy acts on the request in the Assistant's absence and the next ranking deputy acts in the absence of both his seniors. This is the ordinary path of delegation for matters not controlled by particular statute (cf. 28 C.F.R. 0.133; note 28 U.S.C. 510).

The competing considerations are, on the one side, the importance of preventing a lapse of the practical power to approve urgent requests and, on the other, satisfying the statutory duty to obtain an approval from an officer of defined senior responsibility. Section 0.178 can be, conceivably, read as authorizing redelegation, in case of the Assistant's absence, to any of his deputies, but there is ambiguity since the plural may refer to "the deputy" of each of the Assistants named in Section 0.175(b).

 It must be doubted that so loose a procedure comports with the Congression-

al purpose. The statute requires approval by an Assistant, not a Deputy Assistant. That purpose may be one that can never be carried out in the sense of genuinely having the Assistant make a deliberative decision in each case, but it can be carried out to the extent of fixing accountability upon him, and so much the Congress has made clear. It is concluded that the letter authorization in defendant Kondo's case is insufficient.

That does not mean that, had the defendant answered the question in obedience to the order that he would not have been protected. *Cf. Garrity v. New Jersey*, 1967, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562. The protection follows from the coercion. But that is not the present case. Here the question is whether the defendant could be held, after the event, to have been guilty of a criminal contempt in disobeying an order which the United States Attorney had not been authorized to request.

It is

ORDERED in each case that the indictment is dismissed.